Good morning. Good morning, Your Honors. Mitch Tilner for the appellants, Zurich and Universal. I'd like to reserve five minutes for rebuttal, and I will try to watch my clock. Thank you. This case involves a breach of an arm's length commercial contract, under which Zurich agreed  The jury found breach of contract, awarded $1 million in damages. And Zurich does not challenge that award. If that were the end of the story, we wouldn't be here. But due to certain rulings by the district court, plaintiffs were permitted to transform their contract case into a massive tort action. And the result was $10 million in non-contract damages, comprising $4 million in disgorgement of Zurich's profits, and $6 million in punitive damages. The brief raises multiple issues, as the court knows. I would like to focus on three this morning. First, the judgment for breach of fiduciary duty is legally insupportable. Second, the court's instructions on fraud were legally erroneous, and plaintiffs failed to bear their burden to rebut the presumption that the error was prejudicial. And third, even if the fraud instructions were correct, the amount of disgorgement damages was unsupported by evidence of conscious wrongdoing. So turning first to breach of fiduciary duty, Idaho law holds, and plaintiffs acknowledge, that no fiduciary duty exists unless the circumstances show that the party claiming the duty had an objective basis for believing the other party was acting not in its own interests, but in the interests of the first party. Here, the parties negotiated an arm's length commercial contract, two sophisticated parties. Plaintiffs had no reason to believe Zurich was not acting, at least partly, if not largely, in its own interest. To the contrary, Mr. Edmark testified, quote, we teamed with Zurich for mutual benefit to make Zurich more profitable and Edmark more profitable. And indeed, it was mutually profitable for 18 of the 19 years. Yet, the district court found a fiduciary duty as a matter of law. None of the court's reasons withstand analysis, however. I'll briefly go through the court's reasoning. The court first said, plaintiffs gave funds to Zurich to manage in their best interest. There's no evidence of that. Zurich did not agree to manage funds in plaintiffs' best interests. Zurich agreed to manage the account so the funds would be sufficient to pay plaintiffs' chargebacks or refunds to customers. Simply handling funds on behalf of another party does not create a fiduciary relationship, particularly in the face of contrary language in the contract. And here, we had contrary language. This contract stated, plaintiffs had, quote, no relationship with company other than that listed in this agreement, close quotes. And the agreement did not mention any fiduciary duty on Zurich's part. In fact, the parties knew how to create a fiduciary duty when that was their intent. The contract elsewhere, the vehicle service dealer agreement, places a fiduciary duty on plaintiffs. In the dealer agreement, plaintiffs agreed to hold all funds received on behalf of Zurich in a fiduciary capacity as our trustee. Thus, the contract imposed a fiduciary duty on the plaintiffs in certain respects, but not vice versa, no duty on Zurich. But counsel, I mean, it is very clearly a very different relationship than a bank, like where you're just putting your money and depositing it and it sits there. Here, Zurich was expected to invest it and manage and put interest into it and manage how much is supposed to go into the fund from time to time. So that seems a lot more than a simple depositing money scenario, which you seem to be describing. Your Honor, part of it was akin to a depository scenario. The plaintiffs would deposit funds into the account, and then Zurich would use the funds to pay these chargebacks. Those were contractual duties. They did have a number of duties under the contract. They had to project future liabilities. If necessary, they had to raise the fee or the deposit amount to ensure a sufficient fund. Those were all contractual obligations. Zurich was careless. Zurich was sloppy, didn't get those things done. Don't the facts show that it's beyond just a contractual duty? Didn't Zurich have an obligation to kind of use its expertise to determine how much they should set aside? In other words, I'm looking at S.E.R. 861 with testimony that the sole reason we decided to enter into a contract with the insurance companies is because they have the expertise to anticipate future unknown liabilities, and that's what they do. So like an insurance company, the plaintiffs entered into the relationship with Zurich to kind of cushion themselves against the risk. And Zurich was supposed to figure out how much money was to be set aside and to adjust the payments as necessary to do that. So how do you respond to that record? Yes, Your Honor. First, let me emphasize, as we do in the briefs, this was not an insurance relationship. Zurich was not acting as an insurer. No risk was transferred to Zurich. The plaintiffs funded the account, and the account paid for the plaintiffs' chargebacks. With respect to the experts. I get that, and there's no perfect fit within the law. I think we sort of look to whether there are characteristics in this case that would trigger fiduciary duty, and that's why I came up with that portion of the testimony, that they were essentially trying to insulate themselves from some risk by relying on the expertise or the judgment of Zurich. Well, they were trying to prepay a risk, Your Honor. The risk was always there. It was never going to go away. The plan was, we will prepay in $80 increments our future liability. You, Zurich, manage the fund. Keep it on your books. When the customer cancels, you disperse the funds so we don't have to worry about it. You do this administrative task for us. Now, it's true. Zurich was supposed to project future liabilities, and that was part of the contract, but the fact that one party relies on the expertise of the other does not create a fiduciary relationship. That's common in many commercial contracts. Wasn't the provision called a no chargeback provision? So to me, that suggests that there was a transfer of risk. There was no transfer of risk, Your Honor. Plaintiffs did not pay a premium. They did not buy insurance. Zurich did not assume any risk. Any risk, if the chargeback had to be paid, it would come out of plaintiff's money, not Zurich's money. Zurich paid its own share of the refund because it had a part of the profit when the dealers sold the warranties. Zurich made a profit on that sale. That was the whole reason for the relationship. Zurich's profits did not come at the expense of plaintiffs. But did they call it a no chargeback provision? It seems like that's almost a guarantee. They called it a no chargeback provision.  but when you read the contract, what you see is defendants prepay their own liability. There's no insurance. And plaintiff's expert agreed. This is not an insurance contract. So the court's second reason- They prepaid, but does Zurich have the obligation under the contract to increase the amount of prepayment if it determines that the payments weren't sufficient to meet the anticipated liabilities? Yes, Your Honor. Zurich had that obligation. It did not meet that obligation. It thereby breached the contract. And that's what the contract damages represent. That Zurich did not come through and fulfill its obligation to project future liabilities, raise the fee accordingly. That's one of the reasons the fund became insolvent. That was a breach of contract. The court's third reason for finding a fiduciary duty was, quote, plaintiffs presented evidence Zurich guaranteed the account would bear interest. Close quotes. First, there's no evidence Zurich ever guaranteed the account would bear interest, either in writing or orally. The court can read the contract. There's nothing in there. In fact, it says dealers shall not earn interest or income on the account. But in any event, we don't have to debate that because a failure to pay guaranteed interest would be a breach of contract, not a breach of fiduciary duty. If a bank doesn't pay interest on the depositor's account, that's a breach of contract. That's not a breach of fiduciary duty. So for these reasons, we would ask the court to reverse the judgment for a breach of fiduciary duty with directions to enter judgment for Zurich. But just so I'm clear on the relationship among the issues, the jury said that it's, both the discouragement and the punitive damages independently rested on all of the theories in the case. So even if we agree with you on the lack of a fiduciary duty, could you address the fraudulent inducement claim? Because that would be independently sufficient. Yes, I understand that, Your Honor. If you agree with me on the breach of fiduciary duty, then I would like to explain why you should reverse, at least for a new trial on fraud, because of instructional error, which knocks out the fraud theories. This instructional error taints all the fraud theories. Under Idaho law, when a plaintiff seeks damages for fraud, the plaintiff must show, quote, actual pecuniary damage, actual pecuniary damage. Over Zurich's objection, the instructions on fraud given in this case on each fraud theory did not require the plaintiff to prove actual pecuniary damage. It omitted that element. Instead of requiring proof of actual pecuniary damage, the instructions merely required plaintiff to prove Zurich realized a net profit from its conduct. That was legal error, omitting an essential element. Now, plaintiffs have two responses. First, they say the instruction was correct. When Zurich earns a net profit, plaintiffs suffer actual pecuniary damage. They're the same thing. That's not true. And this case is a perfect counterexample. Zurich's profits did not come out of plaintiff's pockets. Did not come at plaintiff's expense, as in all the cases on which they rely. In those cases, the defendant profits because of the plaintiff's overpayment for something, or plaintiff's agreement to accept something worth less than what the defendant had represented. Here, Zurich's profits came from the same source as plaintiff's profits, the customer's. So, I mean, you may be right about that, but what do we do with the district court's alternative finding that the evidence supported the conclusion that dealers would have been better off if they had entered into an arrangement like this with somebody else? And so that was sufficient to satisfy the damage element.  is something for the jury to consider. A properly instructed jury can consider that. Counsel can make that argument to the jury. The problem here is the instruction never required the jury to consider that. Didn't require them to find actual pecuniary damage. And the judge and all the parties agreed the damages awarded were disgorgement. The jury didn't award any actual pecuniary damages for lost profitable contracts that might have been entered. The problem was the instruction didn't require plaintiffs to prove or the jury to find those future contracts with third parties might have been profitable. Did Edmark make that argument to the jury? Excuse me? Did Edmark make that argument to the jury? That they were injured because they could have gone with a competitor? Mr. Edmark testified vaguely that their current situation with the competitor was more profitable. They didn't quantify it, so they couldn't ask the jury to award it, but what they asked for was disgorgement. That's what they asked for. That suggests that it could have been, even if it was an error, it was a harmless error, if that is clearly an injury. Well, it can't be harmless, Your Honor, because first of all, it's their burden to show harmlessness, but setting that aside, we know, we know the jury did not find or award any actual pecuniary damage, an essential element of fraud. We know they didn't find or award it. They only awarded disgorgement, and that is not an element of fraud. It's actual pecuniary damage. Disgorgement is not the same thing, because the disgorgement, is there its profits didn't come from plaintiffs. The profits didn't represent any injury to plaintiffs, so when the jury awarded disgorgement, it's not necessarily finding plaintiffs suffered any injury. So isn't that a different question, though? I mean, they granted the fraud, they gave a verdict in favor of them on fraud, so they found a pecuniary injury. Whether or not that equals disgorgement is a separate question. Well, Your Honor, the fraud instructions listed all the elements. None of those elements was actual pecuniary damage. So we know the jury didn't find that. What they did find was disgorgement, because that was the substitute element that went into the instruction. They found disgorgement. The court recognized that. The parties recognized that. Let me turn to the disgorgement damages. If the court decides Zurek's net profit was indeed actual pecuniary damage to plaintiffs, the disgorgement damages should still be reversed, and the amount redetermined for another reason. The instructions required plaintiffs to prove by clear and convincing evidence that Zurek realized net profit from conscious wrongdoing. Conscious wrongdoing is acting with knowledge that you're doing wrong, or with knowledge that you're violating the other party's rights. There's no evidence, let alone clear and convincing evidence of conscious wrongdoing between 1996, when the parties got together, and 2014, when Zurek discovered they had dropped the ball. They hadn't kept the fund solvent. That's, 2014 is when they discovered the problem. Did you raise that point, that you didn't know about this before 2014 in your J-Mall or new trial motion? Yes, Your Honor. It's in the post-trial motion at pages 30 to 33. There was evidence of breach of contract in the early years. There was evidence of carelessness. There was evidence of accounting errors. Zurek discovered the problem in 2014. Assuming that Zurek's failure to immediately advise the plaintiffs about what they had discovered in June of 2014, assuming that was conscious wrongdoing, then we're talking about conscious wrongdoing for about a year. June 2014 until the contract was terminated in May 2015, less than a year later. So, we don't have 20 years of conscious wrongdoing, which is what plaintiffs argued and what the jury awarded. There's no, there's evidence of breach. There's evidence of sloppiness. There's no evidence of conscious wrongdoing as the court defined it. So, if the liability for fraud survives this appeal, the judgment should be reversed for a new trial on the amount of Zurek's profits resulting from any conscious wrongdoing starting in 2014. And I'll reserve the remainder of my time. Thank you. Thank you. May it please the court. Your Honor, my name is Eric Stedham. And in addition to my colleague, Jen Jensen, we're here to represent Edmark and the Chalfant Dealerships. First, I think we have to note that each and every one of those arguments that we were just presented on behalf of Zurek are built on a rejected, recycled notion of what the contract required that was wholly rejected by the trial court, wholly rejected by the jury. In effect, what Zurek does throughout the briefing in this is invert the standard of, the standard that needs to be met here, by and large, it's substantial evidence. The arguments that you just heard, and I'll go through them one by one, each turn on the spin that Zurek is giving the facts, either by omitting facts, characterizing things, or simply ignoring admissions by their own parties. Now, they don't appeal the breach of contract ruling. They don't appeal the jury instructions relating how that contract was to be construed, construed against Zurek and Universal as the drafters, construed so that it made sense as a whole, and they don't dispute any other aspects of that jury instruction that that jury was asked to rule on and decide regarding that contract. And what the jury did look at and what is in that contract is a lot different than what was just spun right now. If you give the inference, as you need to, we believe, to Edmark and Chalfant, what you have built into that contract, which is the foundation, we will admit, for a lot of the claims that come out of that, what's built into that contract is an obligation for Zurek and Universal to manage these funds, to manage these funds using their expertise. They're the experts. They're the insurance industry folks who know how to forecast liabilities for their products. There's a duty in there where Zurek wrote in and maintained, and this was acknowledged, sole discretion regarding how much to charge. There's also a duty that's built in there that was ignored in the presentation that just occurred to invest for the benefit of the account. Now, as the court will note in the briefing, there was an effort by Zurek to address that language, to say, there's some additional language saying that the dealers can't take insurance. That's not what we're talking about. What the jury was presented with, with testimony and the plain language, and the admissions of Zurek personnel, was that there was a duty to invest those funds, to grow the fund. That also was in line with the jury instruction that is not appealed, that this thing needs to be read to make sense, to be read as a whole, to be read based on industry standards. The very last line of the gosh darn agreement says no chargeback program in it. It was sold to Edmark and Chalfant for 20 years as a no chargeback agreement. Everybody in the industry knew what that meant. Now, Zurek Universal chose to put some mechanisms in there to achieve that, and in doing so, they expressly created fiduciary duties. As Judge Windmill in his post-trial briefing noted, it's virtually a hornbook case of fiduciary duty. Now, Idaho law does not require you to label a duty as fiduciary if it's in a contract. It can contractually create a fiduciary duty just by its nature. And what we had here was sole discretion, management, maintenance of funds for a purpose that was for the primary benefit of Edmark, excuse me, and Chalfant. And by the way, that's the standard, primary benefit. And the court properly can look at this subset of an overall arrangement, this no chargeback program, to determine whether there was a fiduciary duty, even if there aren't fiduciary duties in other aspects of the agreement. Is it a dispute of fact of whether or not it really was a no chargeback agreement? It seems like there was nothing literally in the agreement that said that, even though it was sold that way. So what's the answer to that? So, Your Honor, what I would say is, there is that reference to a no chargeback agreement in the very last line of that agreement, which the court might have missed. And I'll get you that at CR side. But it's the last line of one of the examples of the... What did it explicitly say? It refers to this no chargeback program, Your Honor. Well, that's, but that's not a... I mean, that's just a description. It doesn't say that, you know, Edmark will never have to pay a chargeback. Well, so, Your Honor, what I would refer to is the fact that the no chargeback agreement was referred to that. It was also set up in a way so that Zurich was to use its expertise and best effort to make sure that that didn't occur. Now... I agree with that part. Your Honor, from our position, we do not believe it changes anything in the case and any of the claims. The fact that there could potentially be, even though they perform their fiduciary duties and the parties all performed, that there might have been some obligation under the terms of the agreement for Edmark and Chalfant. But that's not what this case is, Your Honor. This case is one in which there were fiduciary duties specifically spelled out by Zurich itself as to what it was going to do. And the important thing is, there's a couple of pieces of testimony, Your Honor, I think that go around this contract because unlike what is being said, the position we believe is being taken by Zurich in the briefing that this court should just look at their interpretation of the contract, dead stop, don't look at anything else. Because of the ambiguity, the jury properly was presented with evidence from Mr. Chalfant that he had asked specifically for a no charge back agreement. This was presented to him as satisfying that obligation. He also has testimony shortly after the agreement was set. Well, I'm looking at it, I think I'm looking at the right one on ER 976, says the company will charge a dealer will be obligated to pay company any deficiency. So that suggests that it's not really a no charge back. It's... So, Your Honor, here's where I would differ with you and maybe it's nuance, is that the record is clear that there is a concept of no charge back in the industry. Our position is what was set up here was a type of no charge back agreement. Now, it did have some risks if you looked at the agreement, but it also had an obligation and Your Honor, we think this just accentuate, builds up the fiduciary nature of this relationship. And that is that Zurich was to make its best efforts to ensure that that outcome that you just referred to didn't occur. And Your Honor, I would also say, and this is where I was getting at Your Honor, with regard to the importance of considering what was presented to the jury around that contract. We've cited to the fact that at 6SER759, Mr. Dark, who was the principal contact, and this is 2009-ish, Your Honor, down the road, but it's continuation of the pattern where Mr. Dark is asked by the new owners or a new owner at the Chalfont dealership, how's this work? And he says, back in email, Zurich pays both dealer profit and refund, dead stop. And that there was testimony shortly after the signing of the agreement involving Mr. Powell, and he was the one who negotiated the agreement. Mr. Chalfont testified that shortly after they signed the agreement, and this is at 3SER86770, that Mr. Powell told him that the program was working well. And why that's significant, Your Honor, is, and I want to take a little time to identify that, now there's a lot more, but this notion that there wasn't any contact, any representation, any perpetuating or building up of the expectations of this trust and confidence relationship is just to disregard much of the record. Because this was being sold for 19 years to Edmark and Chalfont as a no charge back program. Every time they were being asked and were submitting $80, they were both being misrepresented to and having information concealed. Because what we know is none of this apparatus that Zurich built into the agreement was ever even started. The program, as this court, I think, has to consider with the inference being given to Edmark and Chalfont regarding the contract and the facts around it, the understanding was that this was going to be for the benefit of them, it was highly valuable, and that it most importantly was in place, including the aspects I talked about before, like investing for the benefit of them, segregating accounts. This was not, by the way- I have a question about the investment part. Was that contractual? Was Zurich supposed to invest it for the benefit of the fund to increase the fund? Yes, Your Honor. There's language in there, there's language in, and we've referred to this in our briefing with specific sites, there was testimony given about that language in the agreement that says, refers to interest for the accounts as being distinct for, from the prohibition against the dealers taking the interest for their own benefit and then not keeping in the account. And there's a couple of pieces of evidence around that, Your Honor, that we consider, properly consider, I believe, admissions from Zurich. There was testimony from Mr. Jenkins when he was questioned about that contract language and he was not only a witness to trial, he was a 30B6 witness for Zurich and Universal. And he testified, yes, he agreed with that reading that there was to be interest for that. Further, Your Honor, there was testimony, one, there was much, but there was one, for example, that Zurich was discounting dollars and anticipating future dollar value, which would indicate that they understood that there was sub-level interest. And at the risk of maybe going a little bit afield, Your Honor, I would also reference that this needs to be considered in the whole panoply of what was not concealed, well, excuse me, what was concealed and what was not misrepresented because these dealerships were highly profitable to Zurich and they were top sellers in their region and continued to be till the end of this. They were a priority. So the record that the jury was provided made it very clear that this was an account that these folks weren't gonna use, lose at Zurich. And that also is part of what goes into, and I'm jumping back, Your Honor, I apologize for this, but touching on this notion of fiduciary duty, it's not just in the contract, but it's in how these folks work together. There's testimony from Mr. Dark that he considered himself to be a valued member of the management team at these dealerships. There's testimony that Judge Windmill relied on with regard to fiduciary duty, that, as he said, was legion regarding the trust and confidence that was being placed into Zurich and Universal regarding regulatory matters, regarding running of this program. It was referred to as a partnership by these folks. Now, Idaho law allows for fiduciary duties to be created under contract. They don't need to be labeled fiduciary duties. They can arise under contract. They can also arise outside contract, and they can arise, as they did here, in a combination, a combination of the terms of that contract, the representations that were made for 20 years, and then the relationship and the nature of the business that these folks were in for 20 years. But, counsel, it wouldn't have been a violation of the contract if Zurich never invested the funds, correct? Your Honor, we would disagree with that, and we believe the jury most likely did, too, because there was evidence, again, about that obligation for them, excuse me, to provide interest. There was also, I don't know if it's catching, Your Honor. Yeah, no, sorry, it's spreading. No, I meant that in a non-COVID-y jurisdiction. I got it. But, Your Honor, what I would point you to is the industry expert that testified about the types of things that a party would need to do in these relationships, and it didn't matter whether you called it an insurance contract or not. That's not the point. That expert testimony was let in, and it explained what is a fiduciary duty and what a fiduciary needs to do and the steps they need to take when they're managing towards a goal and towards future expected liabilities. And, Your Honor, going back to that question of interest, it also goes to the jury instruction relating to that this contract needs to be read as a whole and to make sense. The testimony from the dealers and those around them, and we believe even the admissions that were provided by the folks at Zurich when they're on the stand, make it clear. It would make no sense. If you accepted this theory of the contract that was presented to the jury, rejected, now is not appealed, that somehow there was absolutely no burden on Zurich, that these folks at Edmark and Chalfant thought that they would prepay. That's silly. Who's gonna prepay and not use the value of their money? They understood that they were being protected, that they were gonna get something of value. What is now being sold was rejected at trial, and that is that there was nothing really of value in this. Well, I think that bleeds into the fraud claims, but it also bleeds into this, Your Honor, which I think goes to punitive damages and a number of other issues, and that this is much, much more than a breach of contract case, is what we saw through discovery was that this program was just never put in place. It was concealed. It was represented as still being there. They were still taking the money. They were still making comments that this is valuable. New dealerships were still being pitched on it as if it was in place, all of which constitute misrepresentations, all of which constitute concealment, but what is key in all of that, too, is that what you see in kind of this revisionist history. This was called the No Chargeback Program by Zurich internally for like 18, 19 years. It wasn't until it was clear that they were going to lose the business of the Edmarc dealership and lose the business of Chalfant that they engaged in this revisionist history, where they then at Zurich started to call it something different, and that is the mistake and the disingenuousness, I think, that was captured by the jury at trial when it was presented for 18 years that this was a No Chargeback Program. Was there any evidence, counsel, that Zurich's profits were directly tied to the program? Yes, Your Honor, and I- What was that evidence? The evidence, Your Honor, is one, they received, they were in a relationship with these dealerships, which allowed them to sell Zurich, to sell their policies to the dealership's customers. That's why it's so lucrative and valuable. Now, to jump to the pecuniary, if I could, Your Honor, jump to the pecuniary damage argument that was raised by Zurich, because I don't want to give that short shrift. Zurich is completely misunderstanding what pecuniary damage is, and completely mischaracterizing what needs to be shown to establish the element of damage in a fraud case in Idaho. They didn't talk about here, although it's addressed in the brief, the Jordan case, there's a Walston case, and a Walls case. And what I also want to point out, Your Honor, each of those cases stand for the proposition that it is damage, not only a measure of damage, which can be distinct, but it is damage to be able to show the net profits of the party committing fraud. And the concept in Idaho law is captured pretty simply. In Walston, is a good example, which mirrors here. In Walston, it was a case in which a contract, or a insurance policy, was represented to be of high value when it wasn't. So, if you look to profit, as the Walston court properly said, the damage is reflected in the fact that this money was obtained from the other party for something that wasn't of value. It was overstated, and the court in Walston, and that was followed through, and that was mirrored in Jordan, I should say, and mirrored in the Walls case, is in Idaho that because disgorgement is accepted in Idaho pursuant to the restatement as a form of restitution, that it is pecuniary damage if you can show the net profits of the earnings that were taken from the defrauded party as a result. And that's exactly what Judge Windmill did here. And he was well within Idaho law, I'm jumping to the jury instruction question, in phrasing the fraud questions the way he did. Because the plaintiffs had made it clear that they were going for a disgorgement measure. He put that in to make it clear. He also put in the standard required under fraud cases for disgorgement of the conscious wrongdoing. And he properly built a jury instruction that reflected Idaho law. This notion, this distinction of pecuniary interest, somehow not including disgorgement, or money that was paid for something that was expressed to be more than it is, is just incorrect. Here, the dealerships paid for $80 a month for a program that was represented to be in place that just wasn't in place. It mirrors in many ways, Your Honor, I believe the Walston case. And it mirrors the Jordan case. And it makes sense here where, especially with that long period of time, a party can rely upon, in Idaho, upon disgorgement of damages when it would be difficult or challenging to prove their own out of profits. Well, sure. But I think what I struggle with a little bit is that the Jordan case that the district court and the plaintiffs rely on refers to unjust profits. And it's hard to tell on this record how the jury calculated Zurich's profits. So how tightly tethered the connection was on this particular record. The jury was presented in this, we discussed, the Judge Wimble discussed it in his brief, we discussed it in ours. Expert testimony unrebutted was presented providing two alternative theories based on not only the testimony that was provided regarding Zurich, regarding its profit, profit that it would not have obtained, but for defrauding or committing the other torts. And then also based on an analysis of the value of that money that Zurich wrongly had for some period of time. And we stepped through it, Your Honor, and I believe that if you do not accept the mischaracterization of the facts and create a false timeline that somehow Zurich only discovered in 2014 that it never put a program in place that it promised 20 years ago in any way, shape, or form, then it makes sense, as Judge Wimble identified, that the disgorgement which was set out, excuse me, the net profits which were sent out year by year are relatively easily calculable and it's reasonable to track how a jury would have arrived at those numbers. All right, thank you, counsel. Oh, one more point, Your Honor, just. You're actually over time. Oh, thank you, Your Honor. Thank you. First, Zurich paid everything it owed under the program for 19 years. So to suggest that we never implemented the program, never put it in place, that's incorrect. Zurich paid everything it owed. With respect to interpreting the contract, none of the issues I've raised this morning require the court to interpret the contract. Breach of fiduciary duty, it's a legal issue. You can read the contract. You can grant the findings that the jury made as to what the contract means, the implied findings. It's a legal issue whether that's a fiduciary duty. The instructional error issue doesn't require you to interpret the contract. It requires you to determine under Idaho law whether disgorgement equals actual pecuniary harm. If I could ask though, if the contract required Zurich to invest the funds, that's a very strong indication that there was a fiduciary duty there. The contract didn't require that, Your Honor. The contract nowhere says Zurich must invest the funds. It's not there. That's true, but there seemed to be some parole evidence saying that that's what the parties expected. Well, I believe that's what plaintiffs expected. They testified to that. They never told Zurich it's not in the contract. So that's that. With respect to disgorgement equaling injury,  The plaintiff there was duped into paying the defendant more than his stock was worth. In Watts, the plaintiff was duped into accepting property from which defendant had already extracted value. In Walston, the plaintiff was duped into buying an insurance policy worth less than what had been represented. In our case, it's totally different. Zurich's profits came from the customers, not from plaintiffs, and from Zurich's investment of the funds, neither of which came out of plaintiff's pocket. You're actually over time, but can I ask a clarifying question? I'm looking at the district court's decision here, where he discusses the fiduciary relationship. And it says, the foundation of the fiduciary relationship comes from the vehicle service contracts, providing that dealers pay insurers $80 for every long-term insurance contract, which insurers would hold and manage in a fund to cover dealers' future liability. The insurer's representatives confirmed the structure of this relationship. There's some citations to the transcript. Are you saying that that's not correct? I believe he's accurately describing the program, but what's incorrect is the conclusion that that's a fiduciary relationship. The Erickson case says, simply holding funds for another party and then using them for whatever agreed purpose the parties have, that is not sufficient to create a fiduciary relationship, especially when the contract- It's the management of the funds. Well, it's the administration. There's no evidence supporting the management of the fund? Well, management in the sense that they hold the account on their books. When they get a claim, they pay out. They're supposed to project future liabilities and adjust the fee accordingly. Yes, that's all management, but that's not a fiduciary relationship. That's just a commercial transaction. I understand. Thank you, Your Honor. Thank you very much, both sides, for your argument today. The matter is submitted, and the court is in recess until tomorrow.
judges: NGUYEN, MILLER, BUMATAY